# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**JANE GOFF on behalf of**
**MARION J. GOFF, JR.**

        **Plaintiff,**

**-vs-**　　　　　　　　　　　　　　　　　　**Case No. 6:05-cv-1162-Orl-31KRS**

**COMMISSIONER OF SOCIAL**
**SECURITY,**

        **Defendant.**

## ORDER

Marion J. "Mick" Goff, Jr. applied for social security disability benefits under the Federal Old Age, Survivors and Disability Insurance Program (OASDI), 42 U.S.C. § 401 *et seq.* He asserted that he was disabled as of July 1, 1993. R. 139. His application was denied initially and on reconsideration. R. 45-48, 52-53, 57-58. Goff died before the matter was presented to an Administrative Law Judge (ALJ) for review. Jane Goff, Goff's surviving spouse, continued to pursue Goff's application for benefits following his death. R. 135-36.

An ALJ held a hearing at which Mrs. Goff testified. Mrs. Goff was not represented by counsel at the hearing. R. 23-34.[1]

After considering the testimony and the evidence presented, the ALJ determined that Goff was insured under OASDI through March 31, 1998. R. 14. He found that Goff worked

---

[1] Mrs. Goff does not contend that her waiver of the right to counsel was ineffective.

until July 2003, but that his income records did not establish that he had engaged in substantial gainful activity after the alleged disability onset date.  R. 14, 21.

The ALJ concluded that Goff had had arthroscopic surgery on his right knee and removal of a protruding bone from his left foot (a condylectomy on the left fourth metatarsal). He also had degenerative joint disease of the knees, degenerative arthritis of the shoulders, left foot pain, back pain, and a history of seizure-like symptoms, which had resolved.  The ALJ found that these impairments were severe, but that they did not meet or equal any of the impairments listed in social security regulations.  R. 18.  The ALJ also concluded that Goff did not have any severe mental impairments as of March 31, 1998.  R. 17.

The ALJ determined that Goff had the residual functional capacity (RFC) to lift ten pounds occasionally, sit for six hours, and to stand/walk for two hours in an eight-hour workday, which was sufficient to perform substantially all of the full range of sedentary work. R. 19, 21.  He concluded that Goff's ability to perform sedentary work was not compromised by any nonexertional limitations.  R. 22.

In reaching this conclusion, the ALJ gave substantial weight to the opinions of Dr. Donati and Dr. Papa.  He gave less weight to the RFC assessment made by Dr. Gresham, finding that Dr. Gresham's opinion did not represent Goff's functional capacity before March 31, 1998, the date he was last insured.  R. 19.  The ALJ also found Mrs. Goff's testimony not fully credible for reasons articulated in detail in his decision.  R. 18-19.

Because Goff's past work exceeded his RFC, the ALJ concluded that Goff could not return to his past relevant work.  R. 20.  Relying on the Medical-Vocational Guidelines (the Grids), 20 C.F.R. Pt. 404, Subpt P, App. 2, the ALJ concluded that Goff could perform jobs

that were available in the national economy. R. 21. Therefore, the ALJ concluded that Goff was not disabled. R. 21.

Mrs. Goff requested review of the ALJ's decision. The Appeals Council issued a decision finding no basis to review the ALJ's decision. R. 6-8. Mrs. Goff sought review of this decision by this Court. Doc. No. 1.

The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied Goff's request for review. *See Falge v. Apfel*, 150 F.3d 1320, 1322 (11th Cir. 1998); 20 C.F.R. § 404.981. Therefore, the Court has jurisdiction pursuant to 42 U.S.C. § 405(g).

After the case was fully briefed, new counsel for Mrs. Goff filed Plaintiff's Motion for Entry of Judgment with Remand. Doc. No. 21. In support of the motion, counsel submitted an affidavit of Dr. Gresham dated December 7, 2006, in which Dr. Gresham opined about Goff's functional capacity before March 31, 1998. *Id.* The Commissioner filed a response opposing the motion. Doc. No. 22. In the response, the Commissioner notes that if the Court grants the motion, it should remand the case under sentence six of 42 U.S.C. § 405(g), rather than reversing the decision of the Commissioner and entering judgment for Goff. *Id.* In this order, I will consider the issues raised in the motion in addition to the issues raised in the initial memoranda filed by the parties.

## STATEMENT OF FACTS.

Goff was born on July 2, 1944. He attended four years of college. R. 26. He served in the United States Marine Corps, where he suffered a head injury that resulted in seizure-

like symptoms. R. 145, 158, 174, 182, 188, 319-20. He experienced his last seizure in June 1995. R. 94A, 152, 174, 318.

After leaving the military, Goff worked as a distribution supervisor in a warehouse. R. 146. After he left that job, Goff reportedly worked as a private investigator and bodyguard. R. 31, 158. Mrs. Goff testified, however, that the only work Goff did was to act as a bodyguard for a baseball player for a few months, which was consistent with the lack of income noted by the ALJ. R. 184, 198.

In 1987, Goff injured his right knee, which led to arthroscopic surgery in 1988 and again in 1992. R. 98, 109, 116, 119-21, 219, 254, 643. Alexander T. Carducci, M.D., observed that Goff had degenerative changes in his right knee that progressed by 1991 to severe advanced degenerative arthritis. R. 119-20, 260. Physicians prescribed a knee brace, and Goff used a cane or crutches from time to time. R. 28, 145, 272-73.

In 1988, Goff's left foot was crushed. R. 278. He had multiple surgeries to try to alleviate pain. R. 249, 264, 271, 275-78. Physicians also prescribed use of custom orthotics and special shoes. R. 244.

Goff was a heavy weightlifter, and he used anabolic steroids. R. 247, 312, 342, 522. Beginning in July 1990, he began to complain of pain in his shoulders. R. 117-18, 307. Ultimately, physicians determined that he had a partial rotator cuff tear and rotator cuff disease. R. 257, 567.

He also injured his ankle and left knee. R. 306. In May 1991, arthroscopic surgery was performed to repair a torn medial meniscus in the left knee. The surgery revealed that Goff had early chondromalacia in that knee. R. 259. In July 1992, he declined to consider

additional surgery because he did "not have the ability to become a surgical candidate at this time based on his job status and other social conditions . . . ."  R. 250.  In August 1992, Goff reported that he was doing a lot of exercise for his knee, including weight lifting and bicycling.  R. 247.

As of July 1993, the alleged onset date of his disability, Goff was being treated simultaneously by many physicians for complaints of left foot pain, knee pain, and shoulder pain.  The record reflects that most of these physicians prescribed narcotic pain medication, specifically Darvocet, Darvon, Percocet and Vicodin.  R. 288-312, 338, 341-43, 362, 365-66, 405-13.  Jack L. Gresham, M.D., one of Goff's treating physicians, conducted an audit of Goff's drug use between August and October 1997, and concluded that Goff may have taken more than twenty pain tablets a day.  R. 290.  Goff was also taking medication to help him sleep, due to chronic insomnia, and medication for hypertension.  R. 311, 338, 362.

Norman Donati, M.D., performed yet another surgery on a bone in Goff's left foot in September 1994.  R. 217.  At that time, Goff indicated that he had "been on his foot quite a bit and [was] much more active . . . ."  R. 242.  In December 1994, Dr. Donati indicated that Goff could perform sedentary work.  R. 235.

In 1995, Dr. Gresham recommended that Goff have right knee replacement surgery. Goff declined, indicating that "his situation is such that he can not have surgery at the present time . . . ."  R. 295.

In 1997, Goff was treated by John A. Papa, M.D., a physician affiliated with Jewett Orthopaedic Clinic, for left foot, right knee, and chronic back pain.  In January 1997, Dr. Papa opined that no further surgery was indicated for Goff's foot pain.  He recommended

use of a different form or orthotic and new types of shoes. R. 225-26. In December 1997, Dr. Papa indicated that Goff still had chronic foot pain, but that he was learning to live with it. He indicated that Goff could continue working with restrictions previously noted, which appears to refer to Dr. Donati's indication that Goff could perform sedentary work. R. 224.

In August 1997, Goff told James P. Ryan, IV, M.D.[2], that he had a severe back spasm with pain radiating through his hip and down his left leg with some numbness in his calf as a result of weightlifting. R. 342. An x-ray revealed disc space narrowing in the lumbar spine consistent with degenerative disc disease. R. 342. Dr. Ryan prescribed Percocet. R. 341. In September 1997, Goff sought treatment at the VA clinic for back pain, numbness and tingling in his left leg after picking up a 200 pound dumbbell. R. 311. Sharon Sibert, M.D., a physician working at the VA clinic, prescribed Darvon. R. 311.

In papers submitted to the Social Security Administration (SSA) in May 2001, Goff wrote that he had difficulty concentrating and completing tasks, and that he was irritable and depressed. R. 176. Mrs. Goff also testified that before March 31, 1998, Goff had difficulty concentrating, communicating, and interacting with his family. R. 30. However, there is no indication in the record that Goff complained of mental limitations arising from pain or other problems between July 1993 and March 31, 1998, other than a September 1993 note in Dr. Gresham's files that reflects that Goff was "lonely." R. 649; *see also* R. 594-606 (reviewing psychologist found insufficient evidence to render an opinion as to Goff's mental condition during the alleged disability period). In April 1999, Goff told Wm. David Honeycutt, M.D., the

---

[2] Dr. Ryan's practice was named Ryan & Urbach, M.D., P.A. R. 395. While the ALJ referred to treatment of Goff by Dr. Urbach, R. 16, it appears that the treatment was rendered by Dr. Ryan.

neurologist who had treated him for seizures, that he was having difficulty concentrating and was forgetful. Dr. Honeycutt's impression was that Goff's condition was consistent with pseudodementia that might be related to mild depression. R. 317-18.

In November 1998, Goff was convicted of a criminal offense and served time in prison. R. 29-30. After he was released from prison, his condition seriously declined. He began drinking alcohol to excess. *Id*. He continued to obtain narcotic pain medication from multiple physicians. *See, e.g.*, R. 285A-86, 337, 358, 405. He twice reported that his pain medication had been lost or stolen in an effort to obtain additional refills. R. 334, 355.

Dr. Gresham prepared a functional capacity assessment for Goff on March 31, 1999. He wrote that Goff had limited functional capacity and had required analgesic medication on a regular basis for "the past few years." R. 108. He opined that Goff "has had gradual worsening of his symptoms that in my opinion has produced a level of physical incapacity that severely restricts his ability to work regularly in any type of physically stressful endeavor. He manages his own business by appropriately pacing the demands of his body while dealing with his problems of chronic pain." *Id.* In the opinion submitted in support of the motion for remand, Dr. Gresham opined that Goff's condition before March 31, 1998, would have limited him from walking or standing for more than two hours a day or stooping, and that he would not have been able to sit for four to six hours a day. He also indicated that Goff would have had difficulty maintaining attention or concentration, would have needed to lie down periodically as needed throughout the day, and would have been unable to perform even sedentary work on a reliable and sustained basis. Doc. No. 21 at 7.

In June 2002, Goff was hospitalized for abuse of prescription medicine and alcohol. The diagnosis was polysubstance abuse. R. 391-92, 523, 528, 542-44, 546. In August 2002, he was again hospitalized after attempting to commit suicide. R. 419. Sanjeev K. Singh, M.D., examined Goff. His diagnosis was adjustment disorder with depressed mood, alcohol abuse. R. 421-26. He determined that Goff had a global assessment of function (GAF) score of 30 on admission, and 50 on discharge. R. 423, 429.

Thereafter, Goff was admitted to a VA mental health clinic. Treatment records reflect assessments of alcohol dependence and substance induced mood disorder. R. 457, 461, 464. His GAF score was 35. R. 464.

Goff was taken to an emergency room on October 19, 2002, due to a suspected overdose of drugs and alcohol. R. 621. After he was released, he committed suicide by a gunshot wound to the head. R. 141A, 684. His suicide note reflects that he was in "mortal pain." R. 128.

After Goff's death, Ricardo Bernal, M.D., a psychiatrist, reviewed Goff's records and interviewed Mrs. Goff. R. 683. Dr. Bernal observed that Goff's use of pain medication worsened between 1998 and 2002. R. 684. Dr. Bernal's opinion was that Goff suffered from chronic post traumatic stress disorder and opiod and alcohol dependence. R. 690.

**ANALYSIS.**

Mrs. Goff contends that the ALJ erred by failing to accept Dr. Gresham's functional capacity assessment. She submits that if the ALJ had correctly determined Goff's nonexertional impairments, it would have been necessary to call a vocational expert to determine whether there was work available that Goff could have performed. She asks,

alternatively, that the Court remand the case so that the SSA can reconsider the weight given to Dr. Gresham's opinion in light of his recent clarification that his assessment related to Goff's condition before March 31, 1998, the date he was last insured under OASDI.

The standard of review is well known and need not be repeated in detail here. A court's review of a final decision by the SSA is limited to determining whether the ALJ's factual findings are supported by substantial evidence, *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005), and whether the ALJ applied the correct legal standards, *Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988). "Substantial evidence is more than a scintilla, and must do more than create a suspicion of the existence of the fact to be established. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Walden v. Schweiker*, 672 F.2d 835, 838-39 (11th Cir. 1982)(internal quotations omitted). When the SSA's decision is supported by substantial evidence, the court will affirm, even if the court finds that the proof preponderates against the decision. *Dyer*, 395 F.3d at 1210. The court may not reweigh the evidence or substitute its own judgment. *Id.*

In the present case, substantial evidence supports the ALJ's decision. The ALJ acknowledged that Goff had severe physical impairments that limited his ability to perform exertional activities. He provided a detailed statement of the reasons that he concluded that Goff's limitations were not as severe as those set forth by Dr. Gresham, and these reasons are supported by facts in the record. In summary, the record reflects that despite his impairments, Goff continued to be active and lift weights, and reportedly continued to work. He declined further surgery. Two of his treating physicians opined that he could perform

sedentary work, and neither indicated that Goff had exertional limitations such as those indicated by Dr. Gresham.

Accordingly, while it appears that the ALJ erred in concluding that Dr. Gresham's March 31, 1999, functional capacity assessment did not relate to the alleged disability period, there is no reasonable probability that Dr. Gresham's assessment would result in a different conclusion. *See Cherry v. Heckler*, 760 F.2d 1186, 1192 (11th Cir. 1985)("To justify a remand, the claimant must show that there is 'good cause' for her failure to offer the evidence at the administrative level and that there is a reasonable possibility that the evidence would change the outcome."). Goff had many treating physicians who rendered different opinions about his functional capacity. Even if the ALJ had considered Dr. Gresham's opinion as relating to the alleged disability period, he would have been required to choose which of the treating physicians' opinions to accept. Dr. Gresham's functional capacity assessments contain no detailed description of the reasons he reached his conclusion, which might have supported the ALJ's decision to give more weight to Dr. Gresham's assessment than to those made by two other treating physicians, Drs. Donati and Papa.

Reasonable minds could differ about whether Goff had mental impairments during the alleged disability period. Dr. Gresham's functional capacity assessment and Dr. Bernal's opinion that Goff had post traumatic stress disorder, likely from his military service, supports Mrs. Goff's testimony that Goff concealed his mental condition during the alleged disability period. Yet, as the ALJ found, ample evidence exists to support the conclusion that the functional limitations arising from Goff's mental impairment were not significant during the

alleged disability period. There is no indication that Goff complained of difficulty with concentration or forgetfulness during the alleged disability period. Dr. Honeycutt's examination of Goff in April 1999, revealed only mild depression. Moreover, the record supports the ALJ's conclusion that Goff's condition significantly declined after he was released from prison, which was after his OASDI insured status expired. Because the law requires the Court to uphold the decision of the ALJ and not substitute its own judgment about the weight of the evidence, it would not be appropriate for this Court to revisit the ALJ's conclusions that Goff did not have a severe mental impairment during the alleged disability period when, as here, substantial evidence in the record supports the ALJ's decision.

Because the ALJ concluded that Goff did not have nonexertional impairments which precluded his ability to perform the full range of sedentary work, he was permitted to rely on the Grids at step five of the sequential evaluation process. The law in this circuit requires that the ALJ initially determine whether the claimant's alleged nonexertional impairments limit the ability to work; if they do not, then exclusive reliance on the Grids at step five of the evaluation process is appropriate. *See Reeves v. Heckler*, 734 F.2d 519, 524 (11th Cir. 1984)(citing *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 537 (6th Cir. 1981)); *see also Broz v. Schweiker*, 677 F.2d 1351, 1363 (11th Cir. 1982)(remanding for consideration whether a claimant's nonexertional impairments significantly limited his basic work skills, and then, whether the Grids could be used), *vacated, Heckler v. Broz*, 461 U.S. 952 (1983), *adhered to on remand, Broz v. Heckler*, 711 F.2d 957 (11th Cir.), *modified in other respects*, 721 F.2d 1297 (11th Cir. 1983).

The ALJ applied the correct legal standards, and substantial evidence supports his decision. There is no reasonable possibility that the new functional capacity assessment provided by Dr. Gresham would change the ALJ's conclusion, for the reasons discussed above. Furthermore, there has been no showing why clarification of Dr. Gresham's original functional capacity assessment could not have been presented to the Appeals Council when it was asked to review the ALJ's opinion. *See* 20 C.F.R. § 404.970(b)("Appeals Council shall evaluate the entire record including the new and material evidence submitted if it relates to the period on or before the date of the administrative law judge hearing decision."). Therefore, remand under sentence six for consideration of this assessment is not appropriate.

## CONCLUSION.

For the reasons discussed herein, it is **ORDERED** that the decision of the Commissioner of the Social Security Administration is **AFFIRMED**, and Plaintiff's Motion for Entry of Judgment With Remand, doc. no. 21, is **DENIED**. The Clerk of Court is directed to enter judgment consistent with this Order and, thereafter, to close the file.

**DONE** and **ORDERED** in Orlando, Florida on March 23, 2007.

*Karla R. Spaulding*
KARLA R. SPAULDING
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Parties